(Cuyahoga Co., Court of Common Pleas.)

EMANUEL FEDER et al. v. ISAAC BRUNDO.

Any label which is merely descriptive of the ingredients, mode of composition, characteristic properties, quality or nature of the article to which it is attached, is not the subject of trade-mark. To render a label such a device as to make it the subject of a trade mark, it must be fanciful or arbitrary, and have no reference whatever to the ingredients, mode of composition, characteristic properties, quality or nature of the article to which it is attached.

False representations of trade-marks deprive their owners of legal protection.

It is immaterial whether the representation be contained in the trade-mark itself or not, or made in the conduct of the business if it is such as would disentitle a party to the protection of the court.

———

NEFF, J.

The several questions submitted for decision in this case arise upon a motion, filed by plaintiffs, praying for the allowance of a temporary restraining order.

The petition of plaintiffs, among other things, avers,—and I limit my recitals now from the petition, to such matters as are immediately pertinent to the question to be decided—the petition avers that Emanuel Feder and Marcus Feder, partners doing business as Feder Brothers, are engaged in the business of manufacturing cigars in the city of Cleveland, and, in connection with such business, conduct a factory for the manufacture of cigars; that they are the sole and exclusive manufacturers of cigars of a certain quality and pattern, known as "London Whiffs," and have been and were such for a long time prior to the filing of the petition in this case; that one of the members of the company had obtained letters-patent whereby he acquired the exclusive right to the manufacture and use of certain boxes, and the petition describes such boxes and the manner in which the cigars or stogies were put up and the manner in which they were put into such boxes, ten cigars or stogies being wrapped together and enclosed in tin-foil.

The petition also contains a copy of the label or design which was bound about these packages of ten.

The petition also recites that the defendant has infringed and is infringing the exclusive right of the plaintiffs to the use of the label or design thereon, which the plaintiffs have for a long time been accustomed to wrap about or put over the tin-foil enclosing the packages of ten stogies or cigars.

It is averred also in the petition that the defendant knew at the time he so imitated the label of plaintiffs, that they (the plaintiffs) were vested with the exclusive right to the use of such labels, and that the defendant, by the use of such labels which, as plaintiffs aver, were mere colorable imitations of plaintiffs' trade-mark, knew that they were such mere colorable imitations, and that his use of them was an infringement of plaintiffs' right to the possession and enjoyment of benefits accruing to them from their trade-mark.

This is substantially what is averred by the plaintiffs in their petition.

The first question that arises is whether the label in question is the subject of a trade-mark; and next, whether the defendant has colorably imitated such label in such a way as to constitute an infringement upon such trade-mark and of the rights of plaintiffs with respect thereto. And, third, whether any privilege was granted by plaintiffs to defendants to use the trade-mark or label in question. The first question presented is, therefore, what is the subject of a trade-mark. I find in section 1085, vol. 2, High on Injunctions, this statement: "To warrant the exercise of equitable jurisdiction, in these cases," referring to cases arising from alleged infringement of trade-marks. "there must be, first, the existence of a trade-mark; second, the fact of an imitation, either directly or with such variations as are merely colorable; and third, the fact that such imitation is made without the license, or acquiescence of the owner." Citing in this connection, the case of Kinahan v. Bolton, 15 Ir. Ch., 75. This seems to me to be a very intelligent analysis of the elements involved in the question at bar. So that the first question that is to be determined, is, whether the evidence submitted upon the hearing establishes the fact that plaintiffs were the owners of, and entitled to, the exclusive use and enjoyment of the label or trade-mark in question; and whether such label, is, of itself, the subject of a trade-mark.

I am satisfied from the proof, without making any special reference to the details of the evidence, that for the space of two years or more they had adopted and used the label or device in question; that they were the originators or inventors of such label or device; that they had had the exclusive use of it; and that, therefore, if the device, in itself, is such as to constitute it a trade-mark, I am of the opinion that the evidence establishes all of the preliminary facts necessary to give plaintiff the right to its exclusive use, assuming, of course, that it is, in itself, the subject of a trade mark, that, is, that it is the subject of the acquisition of an exclusive right which is entitled to protection.

I omit from the consideration of the case the boxes which were offered in evidence, upon which letters-patent were

obtained, because the infringements of such rights as plaintiff acquired and possessed with reference to the use of a patentable article, are questions of which this court cannot properly take cognizance; nor am I disposed to give serious consideration to the contention tnat plaintiff has acquired any exclusive right to pack cigars or stogies in the manner in which these are packed, because I find that the holdings of the courts have been almost uniformly to the effect that the mere manner of wrapping goods is not the subject of an acquisition of exclusive right to its use, and, therefore, no monopoly can be acquired resting upon the mere invention of some original owner, of packing goods.

Now, what is necessary to constitute a label the subject of a trade-mark? In the case of Kohler et al., appellants, v. Sanders et al., respondents, 122 N. Y. page 65, is a very well considered and well reasoned opinion upon the general subject of trade-marks; and, in this case, I find the test to be this (quoting now from the 72nd page, of the opinion): "In referring to the principles relating to trademarks, and upon which their efficiency as such depends, it may be observed that there is no exclusive right to represent by them an idea, nor can there be an exclusive appropriation of that which is descriptive of the articles to which they are attached, or that which indicates their ingredients, mode of composition, characteristic properties, quality or nature." Citing Morgan v. Iaxwell, 89 N. Y., 292; Amoskeag Mfg. Co. v. Spear. 2 Sanford, 599; Caswell v. Davis, 58 N. Y., 223.

So that it may be said that any label which is merely descriptive of the ingredients, mode of composition, characteristic properties, quality or nature of the article to which it is attached, is not the subject of a trade-mark.

I find by the authorities generally, that in order to render a label such device as to make it the subject of a trade-mark, it must be fanciful or arbitrary, and have no reference whatever to the ingredients, mode of composition, characteristic properties, quality or nature of the article to which it is attached.

Recurring now to the question at bar, I am satisfied that the label, an infringement of which is sought to be prevented by injunction in this case, entitled "London Whiffs," is a device purely fanciful and arbitrary, and, in no way, suggestive of the color, ingredients. mode of composition, of the article to which such label is attached, and that, therefore, the label is itself the subject of a trade-mark or exclusive right to a trade-mark. The evidence establishing. then, that the plaintiffs had used this device for the term of two years or more prior to its adoption by the defendant, and it being now apparent that it is the subject of a

trade-mark, that is, that it is a subject that the plaintiffs could acquire the exclusive right to use, we are remitted to the next question in order, that is, whether the label adopted by the defendants, and now used by the defendants, is a colorable imitation of the label of plaintiffs. Numerous cases in this connection have been cited, and I myself have conducted an examination somewat elaborate in reference to tnis subject.

In the case of Sperry and Company, appellant, v. Percival Milling Co., respondent, 81 Cal., 252, Judge McFarland uses this language:

"The rule governing such cases is that if the limitation of a trade-mark is intentionally so close as to deceive an ordinary purchaser, the defendant is liable, and the fact that an attentive inspection will disclose differences in even many respects between the two articles will not shield him."

The same test is laid down as the one governing this question, in the case of the Philadelphia Novelty Manuf'g. Company v. The Blakeslee Novelty Company, 40 Fed. Rep., 588; also in the case Mumm et al. v. Kirk, Fed. Rep., 40, 589; Cook v. Starkweather, 13 Abbott's Practice (New Series) 392; Davis v. Reid 17 Grant Chan. (U. C.) 69; Hier et al. appellants v. Abrahams et ai. respondents, 82 N. Y. 519. There are many other authorities, but I cite these merely as instances or illustrations; calling attention to the case of Brill v. Singer Manufacturing Company, 41 Ohio St., 127, to the language of Dickman, J., on page 140 of the opinion, in which the court uses this language:

"Io entitle a complainant to relief against a colorable limitation of a trade-mark, he must clearly show not only a property right in himself, but also that the resemblance between the original and the imitation is such as would mislead persons purchasing with ordinary caution."— And citing Robertson v. Berry, 50 Md., 591.

So that it may be said to be settled law that if the similarity between the label adopted by the plaintiffs and that subsequently adopted by the defendant, be such as would probably mislead a person of ordinary caution, then such label so adopted by the defendant, is such a colorable imitation that a court of equity may take cognizance of it. This, then, presents a question of fact, whether there is, then, such a similarity?

In the first place, the proof shows that the wrappers and labels in question, that is, the original and the imitation, were designed by by the same company; that is to say, the defendant employed the same firm or company to make the alleged imitation of the label as had been made by them for the plaintiffs, and had been used by the plaintiffs. The radical difference between the two is that in the

one the cigars or stogies are denominated "LONDON WHIFFS;" that is, in the original, while in the alleged imitation the goods of defendant are denominated "PERFUME PUFFS." In the label of the plaintiffs, there is back-ground of a dark blue; that of the alleged imitation, being substantially the same, but of a more blueish cast. On the label of plaintiffs is a monogram "F. B." and on the label of the defendant is the monogram "I. B." The letters in both are in white, being, perhaps, a clearer white on the "LONDON WHIFFS". The design is, in some essential particulars, slighty different, both bearing, or as it were, containing the words "CLEVELAND O., U. S. A.", the letters being slightly different,—being somewhat larger.in the label of plaintiffs than in that of defendant. But it is perfectly apparent that, taken as a totality, —as a whole, there is a striking similarity between the two. Indeed, they are so closely similar that if a person should see one in the absence of the other, it would be quite impossible with the single exception of the word "PERFUME PUFFS"as distinct from "LONDON WHIFFS" to distinguish one from the other, and, under ordinary circumstances, where the light is not very bright in an ordinary store where such goods are usually placed for sale, or in the evening or in any not very well lighted place it would be practically impossible to distinguish between the two, therefore, it is quite evident that the label of defendant is an intentional imitation of the label of plaintiff. They are similar in design, in color of letters, similar in the diagonal direction of the names across the face of the label, both running diagonally across the top; and, in all their general features, they are practically identical: so that, in a faint light, or upon casual examination, or upon a hurried inspection, such as ordinary purchasers might make, it is certain that the purchaser would mistake one for the other, and that the colorable imitation is such as to mislead the ordinary purchaser. Indeed, I am almost disposed to think that a cautious person,—indeed, I do think that a person using ordinary caution would be deceived and would easily suppose cne to be the other.

The theory upon which courts of equity intervene for the protection of parties against infringement upon trade-marks is this: They look to the protection of the public; the purpose of the court being to protect the public against any foisting upon them of the goods of one as the goods of another. So that, where the goods of A, for instance, have acquired a reputation in the market; B shall not be allowed to imitate the trade-mark of A, or put upon his goods such a label as shall tend to deceive the public and induce the public to believe that in the purchase of B's goods they are, in fact, purchasing A's goods; and it is to prevent this fraud upon the public, that courts of justice have always predicated their interference for the protection of trade-marks.

As to the third question, whether there has been any license or acquiescence on the part of the plaintiff in the use of defendant of this imitation, there is no evidence tending to show any such license or acquiescence.

I am, therefore, of the opinion that plaintiffs are entitled to the exclusive use of the trade-mark in question; that it is a trade-mark; that defendant's label is merely a colorable imitation of the trade-mark of plantiffs. with no license given for its use on the part of defendant and no acquiescence on the part of plaintiff in the use o' such label by defendant. It would, therefore, result that the plaintiffs would be entitled to a temporary injunction unless the defense which is set up by defendant, be valid, to-wit, the contention being that the plaintiffs themselves have been guilty of fraud in connection with the use of their trade-mark and the sale of their goods in such sense as to disentitle them to any intervention on the part of a court of equity.

The evidence tends to establish that the plaintiffs, in the conduct of their business connected with the manufacture and sale of the brand of stogies or cigars known as the "LONDON WHIFFS" have,in several instances, notably in the publication of what is known as the "TOBACCO LEAF." containing an advertisement of this tenor, "FEDER BROTHERS STRAIGHT HAVANA LONNDON WHIFFS, manufactured by FEDER BROTHERS, CLEVELAND, OHIO." Again, it is made apparent from the testimony, that in the course of the business of the plaintiffs, they advertised quite extensively and displayed a sign-card on which was "FEDER BROTHERS, Makers of LONDON WHIFFS," and also a much larger design put up in places where these goods were to be sold, denominating them as "HAVANAS"; and the contention of the defendant is, first, that the goods are not "HAVANAS;" that is, that the tobacco out of which the cigars in question are made, is not tobacco grown in Havana. That the description of the plaintiffs, of their goods as "HAVANAS," or "STRAIGHT HAVANAS," is a fraud upon the public of such a character as to disentitle the plaintiffs to invoke the intervention of a court of equity to protect them in the use of their trade-mark, because the plaintiffs themselves are guilty of fraud in connection with the manufacture and sale of the cigars in question.

The first case cited in support of defendant's contention, is that of The Solis Cigar Company v. Pozo & Sugarez, 16 Col., 388. I read now from the third branch of the syllabus:

"3. Example—Two trade-marks that *do not* infringe.—A trade-mark consisting of the word 'EL CABIO' at the top, under them the picture of a tobacco plant in bloom, the words 'FABRICA TOBACCOS' on either side of the plant, beneath the plant the manufacturer's name, 'De R. Solis,' under that the word 'HABANA,' lower down the word 'Copyrighted,' and at the bottom of the label the words 'R. Solis, Manufacturer, Denver,' is not infringed by a label consisting of a picture of a tobacco plant in bloom, having the words 'EL CAVIO' on either side of the flowers; the words 'Fabrico Tobacco' on either side of the stem, and beneath them the firm name, 'De Pozo & Suarez', below the picture the word 'Habana' and at the bottom of the label the words 'Pozo & Suarez, Manufacturers, Denver, Colo.' Had the words, 'El Cabio,' together with the picture, constituted the Solis trade-mark, the infringement might have been complete; but it took these words, the picture and the words 'Fabrica Tobacos,' and 'De R. Solis' to make the brand."

The fifth branch of the syllabus reads: "5. False representations of trade-marks deprive their owners of legal protection.—Some sorts of deception may be practiced by the representations of a trade-mark, without loss of the right to legal protection against its infringement, such as matters that would neither be considered nor depended on by purchasers of the manufactured articles, as the word 'copyright,' when in fact the protection of the statute had not been secured. But the deception must not relate to any particulars which the label protects, nor the representations be false to any of its leading elements. The use of the word 'Habana' on a cigar label, when the cigars on which the label appears are only Havana filler, is such a deceit on the public that equity will furnish no relief against an infringement."

It will be observed that the false affirmation with regard to the quality of the tobacco contained in the cigars, the copyright as to which was sought to be protected, and contained in the trade-mark itself.

The next case that is cited, is that of the Manhattan Medical Company v. Wood and Another, 108 U. S. Reports, 218. Reading the first branch of the syllabus:

"A court of equity will extend no aid to sustain a claim to a trade-mark of an article which is put forth with a misrepresentation to the public as to the manufacturer of the article, and as to the place where it is manufactured, both being originally circumstances to guide the purchaser of the medicine."

Continuing reading the syllabus: "When it is the object of a trade-mark to indicate the origin of manufactured goods, and a person affixes to goods of his own manufacture a trade-mark which declares that they are goods of the manufacture of some other person, it is a fraud upon the public which no court of equity will countenance."

The opinion in this case was rendered by Mr. Justice Field. It will be observed that, in this case, the false representation was contained in the label itself; the statement being that the medicine to which the designation, "Atwood's Vegetable Physical Jaundice Bitters," was attached, was manufactured by Moses Atwood, of Georgetown, Massachusetts, when, in fact, it was manufactured by the Manhattan Medicine Company in the city of New York.

In the course of the opinion, Justice Field quotes from the case of The Leather Cloth Company (Limited) v. The American Leather Cloth Company (Limited), reported in the 11 House of Lords' Cases 523. He quotes as follows therefrom: "When the owner of the trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, *or in the business connected with it*, be himself guilty of any false or misleading representation; for if the plaintiff makes any material false statement in connection with the property he seeks to protect, he loses, and very justly, his right to claim the assistance of a court of equity."

Justice Field cites in the opinion, the case of Pidding v. How, 8 Simons, 477, the syllabus of which is this: "The plaintiff had made a new sort of mixed tea, and sold it under the name of 'Howqua's Mixture;' but, as he had made false statements to the public, as to the teas of which his mixture was composed and as to the mode in which they were procured, the court refused to restrain the defendant from selling tea under the same name, until the plaintiff had established his title at law."

In the statement preliminary to the opinion itself, I find this language: "The plaintiff, in his labels and *advertisements*, intimated that the mixture was made, by Howqua, in Canton, and was purchased from him and imported into this country, by the plaintiff, in the packages in which it was sold; that the tea which gave it its peculiar flavor, was very rare and high-priced even in China, and was grown in only one province of that country named Kyiang Nan; and that it could not be procured, in England, at any price." In the course of the opinion, the Vice-Chancellor says: "There has been, however, such a degree of representation, which I take to be false, held out to the public about the mode of procuring and making up the plaintiff's mixture, that, in my opinion, a court of equity ought not to interfere

to protect the plaintiff, until he has established his title at law.''

Justice Field cites also in his opinion, the case of Perry v. Truefitt, in which a similar ruling was had. The case of Perry v. Truefitt, 6 Beav. 66, is a case where a misrepresentation was made by a person who had bought of the inventor, the original recipe for a nostrum known as "Medicated Mexican Balm,'' and had sold it as "Perry's Medicated Mexican Balm,''. It appeared that the plaintiff, in his advertisements to the public, had falsely set forth that the composition was "a highly concentrated extract from vegetable balsamic productions'' of Mexico, and as prepared from "an original receipt of the learned J. F. Von Blumenbach, and was recently presented to the proprietor by a very near relation of that illustrious physiologist.'' Which fact the court, in that case, found to be false, and that the plaintiff had stated all this falsely, and relief was refused upon that ground: "The master of the rolls holding that in the face of such a misrepresentation, the court would not interpose in the first instance, citing with approval the decision in the case of Pidding v. How.''

Also, "In a case in the superior court in the city of New York, Fetridge v. Wells, 4 Abbott (N. Y.), 144—this subject was very elaborately and ably treated by Chief Justice Duer. The plaintiff there had purchased a recipe for making a certain cosmetic, which he sold under the name of 'The Balm of a Thousand Flowers.' The defendants comenced the manufacture and sale of a similar article, which they called 'The Balm of Ten Thousand Flowers.' The complainant, claiming the names used by him as a trade-mark, brought suit to enjoin the defendants in the alleged infringement upon his rights. A temporary injunction was granted, but afterwards, upon the coming in of the proofs, it was dissolved. It appeared that the main ingredients of the compound were oil, ashes and alcohol, and not an extract or distillation from flowers. Instead of being a balm, the compound was a soap. The court said it was evident that the name was given to it and used to deceive the public, to attract and impose upon purchasers; that no representation could be more materially than that of the ingredients of a compound recommended and sold as a medicine; that there was none so likely to induce confidence in its use, and none, when false, that would more probably be attended with injurious consequences.''

Many other cases are cited by Justice Field, notably, Connell v. Reed, 128 Mass. 477; and Palmer v. Harris, 60 Penn. St., 156; Justie Field saying: "The doctrine enunciated in all these cases is founded in honesty and good sense; it rebukes fraud and encourages fair dealing with the public.''

Numerous other cases might be cited in which the doctrine is enunciated, that any one who is guilty of a fraud upon the public, in any statement contained in a trade-mark in a monopoly in which he is seeking to be protected, becomes, by reason of such fraud, disentitled to the intervention of a court of equity. However, it is contended that in most of the cases, especially those reported in the decisions of the courts of this country, the false representations were included in the label or trade-mark itself; but such is not the doctrine of the English courts, and such was not the opinion of Justice Field who quotes, with approval of the doctrine of the English courts, that, if in the conduct of business connected with such trade-mark, a party has been guilty of fraud, he shall not be entitled to invoke the equity jurisdiction of the court by injunction, to prevent infringement. However, upon this subject, I find in Brown on Trade-marks, section 492, the following:

"A mere false or exaggerated statement in a public *advertisement* will not deprive the owner of his right to protection.''

In support of this doctrine, the text-writer cites the case of Curtis v. Bryan, 36 Howards Practice, page 33, where "the defendant interposed the objection that the plaintiff's medicine was not what by the advertisement it purported to be; and that it was not perfectly safe or harmless, but that, on the other hand, it contained ingredients which are injurious and baneful to children.'' In that case, the court held, that the mere fact that in an advertisement connected with the business of the parties seeking protection, such fraud would not operate to disentitle such person to protection.

But this text of Brown on Trade-marks, and the case cited in support of the doctrine announced in the text, namely, that of Curtis v. Bryan, is not, in my judgment, supported by the theory which runs through all of the reported cases; much less can it find recognition, countenance or support in the broad and general doctrine of equity, that *he who seeks equity, must do equity*; that a person seeking to invoke the jurisdiction of a court of equity must himself be guiltless of fraud in connection with the matter as to which he seeks protection.

Now the theory upon which the protection of courts of equity is invoked, is, that it is necessary for the protection of the public, to enjoin any one who seeks the defraud the public by colorable imitation of the goods of another and thus foist upon the public under the guise of their being the goods manufactured by another, his own goods which the public do not want, which may be inferior in quality to those for which

they are mistaken, and that thus a fraud is perpetrated upon the public.

Now, can it be said, in principle, that he who, by means of his advertisements, by publication in well known journals in the speciality in question, by flaring sign-boards, by large cards upon which in gilt letters the goods are announced to be such.—can it be said that a person can thus commit fraud after fraud upon the public and secure large sales of his goods, and yet be entitled to come into a court of equity and invoke its protection to preserve to him that monopoly in the enjoyment of which he perpetrates an intentional fraud upon the public?

It seems to me, although it is contended with great zeal and earnestness that in order to disentitle plaintiffs to the protection of a court of equity, the fraudulent misrepresentation must be embodied in the label or trade-mark,—and I am disposed to think that there is no difference in principle between such representation in a trade-mark and such representation out of the trade mark whichever was used for the purpose, and which does accomplish the purpose of defrauding the public or putting upon the market goods under the guise of their being one thing, "STRAIGHT HAVANAS" for instance, when, in fact, they are goods of an inferior quality, the tobacco of which they are made, not being grown in Cuba, the representation being palpably and flagrantly false.

So that, I am disposed to hold that it is immaterial whether the representation be contained in the trade-mark or not, if made in the conduct of the business it is such as would dis-entitle the plaintiffs to the protection on the part of the court.

It will be observed, in the first place, that the cases cited have characterized the claim that the goods, offered for sale by the plaintiffs, have been misrepresented by the plaintiffs, and that the plaintffs have been guilty of fraud and are themselves, therefore, not entitled to an injunction—that this is characterized as a defense.

It will be observed next that it is alleged as an act of fraud.

Fraud is never presumed, and must always be established.

It, therefore, results, from both of these considerations, that the burden of establishing, by a preponderance of the evidence, the facts that these representations made by the plaintiff in the course of his business with respect to these goods, were false.

Now, how stands the proof? I am frank to say that the evidence in this respect is thoroughly unsatisfactory.

Four witnesses have been called in behalf of the defendant, who have been engaged in the business of manufacturing and selling cigars and dealing in tobacco and are now engaged in such business, all of whom say that Havana Tobacco can *not* be raised in America. There are four others of equal intelligence, with equal opportunities to know the facts, and of equal experience, who swear positively that *what is known as Havana Tobacco may be raised from Havana seed in this country.*

The proof, in my judgment, establishes that the tobacco of which the plaintiffs' cigars or stogies are made, is not tobacco imported from Cuba.

The first four witnesses swear that the word "Havana," as applied to tobacco, refers to the place where tobacco is grown.

The other four, with equal assurance, swear that the term has no reference—not the least reference, to the place where the tobacco is raised, but to distinguish its quality; in other words, it designates a very superior kind of tobacco.

Now, this being true, and there being a sort of equipoise numerically and otherwise, between the witnesses arrayed on either side, the proof is left, as I say, in a very unsatisfactory condition.

At first blush, it seemed to me that the word "HAVANA" necessarily implied that the tobacco was raised in Cuba, and the defendant's contention in this respect was a tenable one. But the other four witnesses swear directly the other way and say the word "HAVANA" does not imply the place where the tobacco was grown or is in any way involved.

In this connection, attention is called to the word "BRUSSELS" as applied to the Brussel carpet. Brussels carpet was made originally in the city of Brussels, Belgium, and when the word "BRUSSELS" was used originally, reference was had directly to the place where it was made, but it having been upon the market a long time and coming into current use and been manufactured in this country very largely and almost exclusively, the word "Brussels" as now applied, does not refer to the place of manufacture, but to the quality; and a person purchasing Brussels carpet in this country is never deceived or believes that he is buying a carpet actually made in Brussels. So, with regard to Valenciennes Lace. As originally used, the term necessarily implied the place of manufacture in France, but as now used, no reference is made to the place of its manufacture, in reference to the use of the term in this country.

And many other instances might be cited where articles have been described by the name of the place of their manufacture in some foreign country, but upon being made in this country and still retaining the original name, they are put upon the market under their old name, we know, without deceiving the public or having any reference at all to the place in which they were originally

made, or that they were made anywhere else but in the United States.

I confess that, under the circumstances, the proof is exceedingly unsatisfactory.

I have already called attention to the fact that fraud is never presumed.

This contention being in the nature of a defense, it rests upon the defendant to prove fraud upon the part of the plaintiffs, and in the unsatisfactory condition of the evidence adduced, I am disposed to think that the testimony does not affirmatively establish such fraud as would disentitle the plaintiffs to the allowance of a temporary restraining order. The order will, therefore, be made temporarily restraining the defendant in manner and form as prayed for in the petition, upon the plaintiffs' giving a bond in the sum of five hundred dollars.

Meyer & Mooney, for plaintiff.

Burrows & Rice, for defendant.